UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | W-21-CR-00060 |
| | ) | |
| DEONTE KYRIQUE HICKS | ) | |
| | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS
INDICTMENT**

Comes now the United States of America, by and through the undersigned Assistant
United States Attorney and files this, its Response to Defendant's Motion to Dismiss
Indictment. The Government respectfully submits that the relief the Defendant requests is
inappropriate and requests that Defendant's Motion be Denied.

## I. Statement of the Case

Defendant Hicks pled guilty to 18 USC § 922(n) on February 28, 2022. ECF No.
24. On March 24, 2022, the Court accepted his plea. ECF No. 28. In June of 2022, prior to
sentencing, the Supreme Court announced a new standard for evaluating Second
Amendment challenges in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct.
2111 (2022). Following the new standard announced in *Bruen*, the Honorable Judge David
Counts decided *United States v. Quiroz* in September 2019, finding 18 USC § 922(n)
unconstitutional. PE-22-CR-104, ECF No. 28. That finding is currently on appeal to the
Fifth Circuit Court of Appeals. Fifth Circuit Case Number No. 22-50088.

## II. Arguments and Authority

Defendant's Second Amendment claim fails. He makes no case-specific argument
but contends that § 922(n) is facially unconstitutional. (Def. Br. 15–29.) "To sustain a facial
challenge, the challenger must establish that no set of circumstances exists under which the

1

statute would be valid." *United States v. McGinnis*, 956 F.3d 747, 752 (5th Cir. 2020) (cleaned up).

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment gives law-abiding, responsible citizens a right to keep and bear arms for self-defense. The Court held unconstitutional District of Columbia laws that effectively banned handgun possession in the home and required all guns to be kept inoperable and so unavailable for self-defense. *Id.* at 628–34.

But the Court emphasized that the Second Amendment right is "not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. "[N]othing in [the *Heller*] opinion [was to] be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (repeating *Heller*'s "assurances" as to "longstanding regulatory measures"). The Court meant its list of "presumptively lawful regulatory measures only as examples," not as exhaustive. *Heller*, 554 U.S. at 627 n.26.

In *Bruen*, the Supreme Court "made the constitutional standard endorsed in *Heller* more explicit." 142 S. Ct. at 2134. It explained: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

Applying that standard, the Court held unconstitutional New York's licensing law, which allowed an applicant to obtain a license to carry a gun outside his home only by showing "a special need for self-protection distinguishable from that of the general

2

community." *Id.* at 2123. First, the Court held that the Second Amendment's plain text covered the conduct at issue. *Id.* at 2134–35. The petitioners—"two ordinary, law-abiding, adult citizens"—were undisputedly among "'the people' whom the Second Amendment protects." *Id.* at 2134. And their proposed conduct— "carrying handguns publicly for self-defense"—undisputedly fell within "the right to keep and bear arms." *Id.*

Second, the Court surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether New York's licensing law squared with historical tradition. *Id.* at 2135–56. After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. "Apart from a few late-19th century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need for public carry. *Id.*

## A. The Second Amendment's text does not cover receiving guns while under indictment.

This Court need not consider whether § 922(n) squares with the nation's historical tradition of gun regulation because its modest restriction burdens no conduct covered by the Second Amendment's plain text. Defendant has the burden at this initial stage to show that the Second Amendment covers his conduct. He cannot carry his burden because "the right to keep and bear arms" does not cover "receiv[ing]" guns while under indictment.

### 1. The party challenging a gun regulation has the burden of showing that the Second Amendment's text covers his conduct.

In *Bruen*, the Supreme Court did not address which party has the bur- den of showing that the Second Amendment's text covers—and thus "presumptively" protects—the conduct at issue. *See* 142 S. Ct. at 2130. But it implied that the party challenging a gun regulation has that initial burden.

3

The Court's analysis proceeded in two steps: it asked, first, whether the Second Amendment's plain text covers the conduct at issue and, second, whether the regulation squares with the nation's tradition of gun regulation. *See, e.g.*, *id.* at 2126, 2130. At step two, the Court assigned the government the burden of offering historical evidence to support the regulation. *Id.* To do so, the Court analogized to "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id.* at 2130 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634–635). The Court did not need to say which party has the burden at step one since the parties did not dispute that the respondents were among "the people" whom the Second Amendment protects and that publicly carrying handguns for protection fell within "the right to keep and bear arms." *Id.* at 2134.

Continuing the Supreme Court's First Amendment analogy, the party challenging a gun regulation has the burden at step one. Although the government has the burden of justifying a purported restriction on the freedom of speech, the party challenging the restriction must show that the First Amendment applies in the first place. *See, e.g.*, *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1147 (10th Cir. 2020) ("Plaintiffs had the initial burden of showing that the First Amendment applies to their conduct." (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n.5 (1984)); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) ("The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies."). Here too, Defendant has the burden of showing that the Second Amendment applies to—and thus presumptively protects—his conduct.

### 2. The right to "keep and bear Arms" does not cover receiving guns while under indictment.

Defendant cannot show that the Second Amendment's text covers receiving a gun while under felony indictment. Section 922(n) states: "It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one

4

year to … receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." In contrast to the ban on gun possession by convicted felons and some other groups, *see, e.g.*, 18 U.S.C. § 922(g), § 922(n)'s re- striction is narrow. First, "[b]y its own terms, § 922(n) does not prohibit *possession* of a weapon by someone under indictment, but only shipping, transportation, or *receipt*." *Laurent*, 861 F. Supp. 2d at 85. So it does not bar a person under felony indictment from continuing to possess any guns he had before the indictment. *Id.* at 85–87. "It merely maintains the *status quo* during the pendency of the indictment, a volatile period during which the stakes and stresses of pending criminal charges often motivate defend- ants to do violence to themselves or others." *Khatib*, 2012 WL 6086862, at

*4.

Second, unlike the felon-in-possession prohibition, which is permanent, § 922(n)'s restriction "is temporary. It lasts only from indictment to conviction or acquittal." *Laurent*, 861 F. Supp. 2d at 102. "The prohibition ends with dismissal of the charges or acquittal (or conviction for an offense that does not bar gun possession) or becomes permanent if the defendant is, for example, convicted of a felony or a misdemeanor crime of domestic violence." *Khatib*, 2012 WL 6086862, at *4.

Section 922(n)'s narrow restriction does not burden "the right to keep and bear arms." In *Heller*, the Supreme Court explained that "the most natural reading of 'keep arms' in the Second Amendment is to 'have weapons.'" 554 U.S. at 582. Section 922(n) does not burden that right because it "does not prohibit *possession* of a weapon." *Laurent*, 861 F. Supp. 2d at 85. Thus, § 922(n) did not impair Defendant's ability to "keep" any arms he had before his indictment. He simply could not "receive" new ones during the limited time while he was under indictment, *see* 18 U.S.C. § 922(n), conduct the Second Amendment's text does not address. *Cf. Heller*, 554 U.S. at 626–27 (noting that the Court's opinion did not invalidate "laws imposing conditions and qualifications on the commercial sale of arms"); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185,

5

206 (5th Cir. 2012) (holding that laws did "not severely burden the Second Amendment rights of 18- to-20-year-olds because" they did not ban use or possession but "im- pose[d] an age qualification on commercial firearm sales").

Similarly, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584. "When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—confrontation." *Id.* In *Bruen*, the Supreme Court confirmed that "[t]his definition of 'bear' naturally encompasses public carry" in addition to carrying a gun in one's home. 142 S. Ct. at 2134. Section 922(n) does not burden this right either. Unlike the New York licensing law that *Bruen* invalidated—which directly restricted citizens' ability to publicly carry guns they otherwise lawfully possessed—§ 922(n)'s temporary "receipt" re- striction does not limit what citizens can do with their lawfully possessed guns.

In some contexts, courts have suggested that the right to keep and bear arms implies the right to obtain them. *Cf. Nat'l Rifle*, 700 F.3d at 204– 05 (assuming, despite being inclined to hold otherwise, that the Second Amendment presumptively protects "the ability of 18-to-20-year-olds to purchase handguns from FFLs"). But nothing about that right implies a right of otherwise unarmed citizens to *procure new arms once facing felony charges*, but before the charges resolve. Obtaining a gun in that circum- stance creates distinct risks because one could reasonably "infer a malevolent intent when an indictee finds it necessary to obtain a gun during the narrow period during which an indictment is pending knowing that he will have to give it up should he be convicted." *Khatib*, 2012 WL 6086862, at *4. Defendant cannot show that the founders intended for "the right to keep and bear arms" to protect an indictee's right to obtain guns.

**B.    Section 922(n)'s restriction on receiving guns while under indictment squares with the nation's historical tradition.**

Even if the Second Amendment's plain text covers Defendant's conduct, his Second Amendment claim fails because § 922(n) "is consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2130. The Second Amendment has always let governments disarm or restrict the gun rights of "unvirtuous" or dangerous citizens. The historical record shows a longstanding tradition of categorically restricting the gun rights of groups viewed by legislatures as unvirtuous, and of substantially restricting the liberty of those credibly accused of wrongdoing.

Section 922(n) is "distinctly similar" to those historical restrictions. (Def. Br. 22.) *See Bruen*, 142 S. Ct. at 2131. The constitutional question is not whether § 922(n)'s restriction has existed since the founding. Rather, courts considering present-day gun regulations must "reason[] by analogy." *Id*. at 2132. "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*; *see also Nat'l Rifle*, 700 F.3d at 196 ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

**1.    Section 922(n) squares with the historical tradition of categorically restricting the gun rights of unvirtuous or dangerous citizens.**

The Second Amendment sets forth a "right of law-abiding, responsible citizens." *Id*. at 2131 (quoting *Heller*, 554 U.S. at 635). The nation's historical tradition, however, embraces restricting the gun rights of citizens viewed by legislatures as unvirtuous or dangerous.

**a.** The government has always categorically restricted the gun rights of some groups to promote public safety. In England, officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia

1

Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). And "the act of 'going armed to terrify the King's subjects' was 'a great offence at the common law'" if it was committed with "evil intent or malice." *Bruen*, 142 S. Ct. at 2141 (brackets and italics omitted) (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)). Thus, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see id.* at 259–61 (detailing history).

Likewise, "[t]he historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books." *Nat'l Rifle*, 700 F.3d at 200. The colonies (and later the states) passed laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145.[1] As *Bruen* observed, those statutes "all but codified the existing common law in this regard." *Id.* at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)). Early colonial regulations also "included safety laws … disarming certain groups and restricting sales to certain groups." *Nat'l Rifle*, 700 F.3d at 200. "For example, several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." *Id.*; *see also Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (explaining that "during the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States"); Robert H. Churchill, *Gun Regulation, the Police Power, and the*

---

[1] *See, e.g.*, Acts and Laws of His Majesty's Province of New Hampshire in New England 17 (1771) (statute enacted 1701); Collection of All Such Acts of the General Assembly of Virginia 33 (1794) (statute enacted 1786); 2 Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807 p. 653 (1807) (statute enacted Jan. 29, 1795); A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Pre- sent Time 99–100 (1836) (statute enacted 1801).

*Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157– 60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506–08 (2004); Joyce Lee Malcolm, To Keep and Bear Arms 140–41 (1994).

Historical accounts confirm the founders' attitudes towards disarming potentially dangerous groups. "*Heller* identified … as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 554 U.S. at 604). That report recognized that the government could disarm potentially dangerous or irresponsible people, stating that "citizens have a personal right to bear arms 'unless for *crimes committed, or real danger of public injury*.'" *Id.* (emphasis added) (quoting 2 Bernard Schwarz, The Bill of Rights: A Documentary History 662, 665 (1971)). Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution, recommending "that the said Constitution be never construed to authorize Congress … to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwarz, The Bill of Rights 674–75, 681 (emphasis added). Thomas M. Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, later explained that some classes of people were "almost universally excluded" from exercising certain civic rights like gun rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 29 (1st ed. 1868).

Indeed, "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam) (quoting *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (collecting scholarly sources)); *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012) (same). The

3

Second Amendment thus incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible" and "'does not preclude laws disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)); *see also United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as … limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." (quoting Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002))).

    **b.** The Supreme Court has recognized the historical tradition of disarming unvirtuous or dangerous citizens. In *Heller*, it endorsed "longstanding prohibitions on the possession of firearms by felons and the mentally ill," among others. *Heller*, 544 U.S. at 626–27. The Court "identif[ied] these presumptively lawful regulatory measures only as examples; [its] list d[id] not purport to be exhaustive." *Id.* at 627 n.26. In *McDonald*, the Court reiterated that *Heller* "did not cast doubt on" those "longstanding regulatory measures." 561 U.S. at 786. Likewise, nothing in *Bruen* casts doubt on those longstanding regulations. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (explaining that the Court's decision "does not expand the categories of people who may lawfully possess a gun"); *id.* at 2162 (Kavanaugh, J., concurring) (reiterating *Heller*'s statements).

    Courts relying on this "'virtuous citizen' theory" have thus upheld "modern laws banning the possession of firearms by illegal aliens and juveniles—classes of people who might otherwise show, on a case-by-case basis, that they are not particularly dangerous." *Medina*, 913 F.3d at 159. In *National Rifle*, this Court rejected a Second Amendment challenge to § 922(b)(1) and (c)(1), which restrict the ability of people under 21 to buy handguns, calling that restriction "firmly historically rooted." 700 F.3d at 204. The court explained that the regulation "is consistent with a longstanding tradition of targeting select groups' ability to access and to

4

use arms for the sake of public safety." *Id.* at 203.[2]

Courts have reasoned similarly for other categorical restrictions similar to *Heller*'s nonexhaustive list of presumptively lawful regulations. *See, e.g.*, *Yancey*, 621 F.3d at 684–87 (relying on historical evidence to uphold § 922(g)(3)'s prohibition of gun possession by illegal drug users); *Bena*, 664 F.3d at 1184 (holding that § 922(g)(8)'s prohibition of gun possession by people under domestic-violence protective orders "is consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens"); *Skoien*, 614 F.3d at 640 (same for § 922(g)(9)'s prohibition of gun possession by those convicted of misdemeanor crimes of domestic violence); *Rene E.*, 583 F.3d at 16 (rejecting a Second Amendment challenge to § 922(x), which restricts the ability of people under 18 to possess handguns, and explaining "that the founding generation would have regarded such laws as consistent with the right to keep and bear arms"). In the only post-*Bruen* decision so far addressing a Second Amendment  challenge to a categorical gun restriction, the court ruled that § 922(g)(3)'s prohibition of gun possession by unlawful drug users squares with historical tradition. *See United States v. Daniels*, --- F. Supp. ----, 2022 WL 2654232, at *4 (S.D. Miss. 2022).

**c.** Like the age-based restriction addressed in *National Rifle*, § 922(n) "is consistent with a longstanding tradition of targeting select groups' ability to access … arms for the sake of public safety." *See* 700 F.3d at 203. Section 922(n)'s legislative history shows that, like other categorical re- strictions on select groups, it "reflects a concern with keeping firearms out of the

---

[2] *Bruen* abrogated *National Rifle* to the extent that it held that a gun regulation could survive a Second Amendment challenge under means-end scrutiny, even if it is not consistent with the nation's historical tradition of gun regulation. *See* 142 S. Ct. at 2127 n.4. But this Court was "inclined to up- hold the challenged federal laws at step one of [its] analytical framework," *see Nat'l Rifle*, 700 F.3d at 204, which relied on the historical record and was "broadly consistent with *Heller*," *see Bruen*, 142 S. Ct. at 2127. Nothing in *Bruen* abrogates this Court's or other courts' historical analyses, which were typically considered part of "step one" under courts' pre-*Bruen* case law.

hands of categories of potentially irresponsible persons." *Laurent*, 861 F. Supp. 2d at 82 (ellipses omitted) (quoting *Barrett v. United States*, 423 U.S. 212, 220 (1976)). It thus reflects a permissible legislative judgment that felony indictees are among the potentially dangerous or unvirtuous citizens whose gun rights the government may restrict. Even still, its narrow and temporary restriction on receipt burdens far less conduct than the categorical prohibition of *possession* by other groups, like convicted felons. Although a person who has been indicted but not convicted is presumed innocent, a legislature's decision to restrict felony indictees' gun access is consistent with historical public-safety laws. (Def. Br. 26–27.) A grand jury has found probable cause to believe that a felony indictee has committed "the most serious category of crime deemed by the legislature to reflect 'grave misjudgment and maladjustment.'" *Medina*, 913 F.3d at 158 (quoting *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017)). And, as noted, there is often good reason to "infer a malevolent intent when" someone responds to being indicted by procuring a gun. *See Khatib*, 2012 WL 6086862, at *4.

At the founding, moreover, a felony indictment foretold far severer consequences for the indictee than the loss of gun rights. The standard punishment for a felony was death. *Medina*, 913 F.3d at 158. ("Capital punishment for felonies was ubiquitous in the late Eighteenth Century and was the standard penalty for all serious crimes."). It is "difficult to conclude" that the founding generation would have understood those standing accused of capital crimes, and thus facing death if convicted, to enjoy unfettered gun rights. *See id.* To the contrary, those under felony indictment were among the "unvirtuous citizens," *see Yancey*, 621 F.3d at 684–85, whom legislatures could lawfully disarm.

It does not matter that a "mid-Twentieth century" law created the modern federal restriction on receipt of firearms by those under felony indictment. Indeed, § 922(g)(1)'s

"prohibition[] on the possession of firearms by felons"—which *Heller* expressly endorsed—has exactly the same historical pedigree as § 922(n)'s restriction on felony indictees. *See* 544 U.S. at 626–27. The federal felon- in-possession law too is "of mid-20th century vintage." *Nat'l Rifle*, 700 F.3d at 196. It "was not enacted until 1938, was not expanded to cover non-violent felonies until 1961, and was not re-focused from receipt to possession until 1968." *Id.*; *see also Skoien*, 614 F.3d at 640 (noting that the "first federal statute disqualifying felons from possessing firearms was not enacted until 1938"). Those same 1938, 1961, and 1968 laws created and revised § 922(n)'s restrictions on indictees. *See Laurent*, 861 F. Supp. 2d 82– 84 (describing § 922(n)'s legislative history). *Heller*'s point in endorsing felon-in-possession laws was not that they had existed since the founding but that they were *analogous enough* to historical regulations to be deemed "longstanding." *See* 544 U.S. at 626–27. So too with § 922(n)'s restriction on indictees.

> ## 2. Section 922(n) squares with the historical tradition of restricting the rights of those accused of wrongdoing.

Section 922(n) also squares with the longstanding tradition of restricting the rights—including gun rights—of those accused of wrongdoing. The government has always been able to impose "substantial liberty restrictions" on indicted defendants (including detention or, alternatively, conditions of pretrial release) when needed to promote "the operation of our criminal justice system." *United States v. Salerno*, 481 U.S. 739, 749 (1987). Thus, among other things, a federal court can order a person on federal pretrial release to "refrain from possessing a firearm, destructive device, or other dangerous weapon" if needed to "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B)(viii).

Section 3142(c)(1)(B)(viii) supplies a longstanding analogue to § 922(n). It is "relevantly similar" to § 922(n), *see Bruen*, 142 S. Ct. at 2132, though it is narrower in some ways and broader in others. Section 3142(c)(1)(B)(viii) is narrower than § 922(n) because it requires an

individualized risk assessment whereas § 922(n) applies categorically. Yet § 3142(c)(1)(B)(viii) applies more broadly in other ways: it covers anyone charged with a federal crime (not just felonies), whether by indictment, information, or complaint (the latter not requiring a probable-cause finding by a grand jury). And when a court imposes the firearm condition on a pretrial releasee, it bans *possession* and thus directly burdens the core Second Amendment right to keep and bear arms, whereas § 922(n) only bars receipt.[3]

States also commonly restrict the gun rights of those charged with crimes, and the Supreme Court endorsed those restrictions in *Bruen*. Although the Court invalidated New York's licensing regime giving officials discretion to deny licenses absent a showing of special need, it noted that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." *Bruen*, 142 S. Ct. at 2138 n.9; *see also id.* at 2161 (Kavanaugh, J. concurring) ("[T]he Court's decision does not affect the existing licensing regimes—known as 'shall-issue' regimes—that are employed in 43 states."). The Court described those shall-issue regimes as setting "narrow, objective, and definite standards" to ensure "that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* at 2138 n.9 (quotation marks omitted).

Those shall-issue regimes, in turn, work analogously to § 922(n). Among their objective

---

[3] Defendant's district-court cases addressing the Adam Walsh Amendments to Bail Reform Act do not support his Second Amendment claim. (Def. Br. 27–28 (citing *United States v. Kennedy*, 593 F. Supp. 2d 1221, 1230 (W.D. Wash. 2008); *United States v. Arzberger*, 592 F. Supp. 2d 590, 601 (S.D.N.Y. 2008); *United States v. Torres*, 566 F. Supp. 2d 591, 601–03 (W.D. Tex. 2008)).) That law mandates certain pretrial release conditions for defend- ants charged with certain crimes. *See* 18 U.S.C. § 3142(c)(1)(B). The cited cases held that because the law mandates the conditions without procedural safeguards, it violates the defendant's procedural due-process rights under the Fifth Amendment, and in some instances may violate the Eighth Amendment's excessive-bail clause. The analysis conducted in those cases is inapplicable here: the rights asserted in those cases do not limit Congress's power to define criminal conduct. More, those cases did not ad- dress the Second Amendment, let alone consider whether the gun regulations at issue squared with historical tradition (to the extent they specifically considered the gun regulations at all).

eligibility criteria for obtaining a license, they commonly disqualify those under felony indictment. *See, e.g.*, Tex. Gov't Code § 411.172(a)(4) (requiring that the applicant "is not charged with the com- mission … of a felony under an information or indictment"); La. Stat. § 40:1379.3(C)(10) (requiring that the applicant "not be charged under indictment or a bill of information for any crime of violence or any crime punishable by imprisonment for a term of one year or greater"). Those schemes thus defeat—for anyone under felony indictment—what *Bruen* called the core Second Amendment right to bear arms in public for self- defense. *See* 142 S. Ct. at 2134–35. If the Court views those regimes as consistent with the nation's tradition of gun regulation, then surely it would hold the same for § 922(n), which does not burden the right of public carry but merely bars people from receiving guns while under indictment.

Yet another historical example supports categorically restricting the gun rights of those accused but not convicted of wrongdoing: English and early American surety laws. In England, a "surety of the peace followed an accusation by someone that an individual would likely violate the law in the future." *Young v. Hawaii*, 992 F.3d 765, 791 n.12 (9th Cir. 2021) (en banc), *vacated*, 2022 WL 2347578 (U.S. June 30, 2022); *see also Wrenn v.*

*District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017) (explaining that English surety laws required a person "reasonably accused of posing a threat" "to post a bond to be used to cover any damage he might do" by carrying a gun). As Blackstone explained, "wherever any private man hath just cause to fear, that another will burn his house, or do him a corporal injury, by killing, imprisoning, or beating him; … he may demand surety of the peace against such person." 4 William Blackstone, Commentaries on the Laws of England 252 (1769). And if the person against whom the accusation was made did not "find such sureties, as the justice [of the peace] in his discretion s[hould] require, he [could] immediately be com- mitted till he [did]." *Id.* The surety was "intended merely for prevention, without any crime actually committed by the party, but arising only from a probable suspicion, that some crime [wa]s intended or likely to happen." *Id.* at 249.

9

This common-law surety practice carried over to the American colonies. "In the mid-19th century, many jurisdictions [in the United States] began adopting surety statutes that required certain individuals to post bond before carrying weapons in public." *Bruen*, 142 S. Ct. at 2148; *see Heller*, 554 U.S. at 605 (considering "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" as a means of determining "the public understanding" of the Amendment (italics omitted)). Massachusetts passed the first such law in 1836. *Bruen*, 142 S. Ct. at 2148. Under the Massachusetts law, if any person was armed and could not show a special need for self-defense, he could "on complaint of any person having reasonable cause to fear an in- jury, or breach of the peace, be required to find sureties for keeping the peace." Mass. Rev. Stat. ch. 134, § 16 (1836). "Between 1838 and 1871, nine other jurisdictions adopted variants of the Massachusetts law." *Bruen*, 142 S. Ct. at 2148.

These laws offer another imperfect but relevantly similar analogue to § 922(n). On the one hand, an indictee cannot overcome § 922(n)'s re- striction by posting a bond. (Def. Br. 27 n.10.) On the other hand, § 922(n) has more procedural safeguards than the surety laws since a person could be required to post a bond based on another's oath alone (and sometimes did not even require the oath to establish a completed crime), 4 Blackstone 252, whereas § 922(n) typically requires a grand jury-finding of probable cause that a crime was committed. And the surety laws—like pretrial re- lease conditions and shall-issue licensing regimes—more directly burdened core Second Amendment rights by restricting public carry rather than receipt only. Finally, like § 922(n)'s restriction, which lasts only while a person is "under indictment," the surety laws' restrictions lasted only for a specified time. *See* 4 Blackstone 249–50.

******

In sum, Section 922(n) burdens no conduct covered by the Second Amendment's plain text because it imposes only a temporary restriction on receiving guns but does not burden the rights to "keep" or "bear" them. And regardless, § 922(n) squares with a longstanding tradition of

10

categorically restricting the gun rights of some people, including those accused but not convicted of wrongdoing. This Court should there- fore affirm Defendant's conviction.

## III.CONCLUSION

WHEREFORE, premises considered, the Defendant' Motion should be denied.

Respectfully submitted,

Jaime Esparza
United States Attorney

 //s// Chris M. Blanton
Chris M. Blanton
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of December 2022, I filed this document using the CM/ECF system, which will notify the appropriate parties, including Defendant's Counsel.

 //s// Chris M. Blanton
Chris M. Blanton
Assistant United States Attorney

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

**UNITED STATES OF AMERICA**      **)**
      **)**
**v.**      **)**      **W-21-CR-00060**
      **)**
**DEONTE KYRIQUE HICKS**      **)**
      **)**

## ORDER

On this date came on to be considered the Defendant's Motion to Dismiss Indictment. After considering the Motion the Court finds the Motion should, in all respects, be DENIED.

So ordered on this _____ day of _____, 2023.

_____
Alan D Albright
United States District Judge

12