IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § § | |
| **v.** | § § § | **W:21-CR-00060-ADA** |
| **(1) DEONTE KYRIQUE HICKS.** | § § | |

### MEMORANDUM OPINION

In April and June 2021, Defendant was indicted in Texas state court for possession of a controlled substance, money laundering, and possession of five pounds or less of Marijuana—all punishable by more than one-year imprisonment. Defendant was then indicted in federal court for illegal receipt of a firearm while under indictment for a crime punishable by more than one-year imprisonment in violation of 18 U.S.C. § 922(n). Defendant pleaded guilty to his violation of § 922(n) in February 2022; he has not yet been sentenced.

In June 2022, the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* revamped how lower courts analyze Second Amendment issues. Only a few months later, our sister court held § 922(n) was facially unconstitutional under *Bruen*'s new framework in *United States v. Quiroz*.[1] As a result, Defendant filed this motion to dismiss, seeking to withdraw his guilty plea and asking the Court to follow the reasoning in *Bruen* and *Quiroz* to dismiss his indictment under § 922(n).

**I.    Defendant has provided fair and just reasons for withdrawing his guilty plea.**

Before reaching the merits of Defendant's motion, the threshold question is whether he can withdraw his guilty plea. A district court has the discretion to allow a defendant to withdraw

---

[1] *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) (the Government's appeal is pending at the Fifth Circuit: *United States v. Quiroz*, #22-50834).

1

their guilty plea before sentencing "if the defendant can show a 'fair and just reason.'"[2] That said, the defendant has the burden of establishing the "fair and just reason."[3]

In *United States v. Carr*, the Fifth Circuit gave lower courts seven factors to use when considering withdrawal of a guilty plea: "(1) whether the defendant asserted his actual innocence; (2) whether withdrawal would prejudice the Government; (3) the extent of the delay, if any, in filing the motion to withdraw; (4) whether withdrawal would substantially inconvenience the court; (5) whether the defendant had the benefit of close assistance of counsel; (6) whether the guilty plea was knowing and voluntary; and (7) the extent to which withdrawal would waste judicial resources."[4] An explicit finding on each factor is not required, and the court "should make its determination based on the totality of the circumstances."[5]

Defendant's plea came before the Supreme Court's decision in *Bruen*, which changed the Second Amendment analysis. Defendant also argues that his plea was before the *Quiroz* decision, which concluded § 922(n) was unconstitutional after conducting a detailed historical analysis. The Court finds that based on the *Carr* factors, intervening changes in the law, and the totality of the circumstances, Defendant has provided "fair and just" reasons for withdrawing his guilty plea. Thus, the Court moves to the merits.

II. **The Supreme Court's decision in *Bruen* changed how lower courts analyze the Second Amendment.**

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[6] Before *Bruen*, courts assessed Second Amendment cases through a two-step process that combined a quasi-historical analysis with

---

[2] *United States v. Lord*, 915 F.3d 1009, 1014 (5th Cir. 2019).
[3] *Id.*
[4] 740 F.2d 339, 343–44 (5th Cir. 1984).
[5] *United States v. Still*, 102 F.3d 118, 124 (5th Cir. 1996).
[6] U.S. Const. Amend. II.

means-end scrutiny.[7] Yet that two-step approach was "one step too many."[8] In *Bruen*, Justice Thomas replaced the means-end balancing test—which in effect allowed lower courts to use intermediate scrutiny to balance away an individual's Second Amendment rights—with a test steeped in text, history, and tradition:

> "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[9]

So the threshold question is whether the Second Amendment's plain text covers Defendant's conduct.

### III. The Second Amendment's plain text covers "receipt" of a firearm.

18 U.S.C. § 922(n) makes it "unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to … *receive* any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." The Government argues that the Second Amendment's plain text—"keep and bear arms"—does not encompass receiving a firearm.[10]

Quoting *Heller*, the Government notes that to "keep arms" means to "have weapons" or "possess" and to "bear arms" means to "carry."[11] So anything not "having," "possessing," or "carrying" weapons is excluded.[12] Thus, the Government argues, receiving a firearm falls

---

[7] *See, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019).
[8] *Bruen*, 142 S. Ct. at 2127.
[9] *Id.* at 2129–30.
[10] Doc. 49 at 5–6 (the Government's brief appears to be multiple documents merged into one with a mixture of out-of-order page numbers and cites to records from other cases. Thus, the Court will use the PDF's page numbering when citing the Government's brief.).
[11] *Id.*
[12] *Id.*

outside the Second Amendment right to "keep and bear arms."[13] Although that argument may be disguised in fine clothes, it gives away too much.

First, excluding "receipt" from "keep and bear" lacks foundation in plain language because the verbs "have" or "possess" include the act of receipt. For example, "to have" means "to be in possession of . . . *something received*."[14] Therefore, "to have weapons" would encompass the past receipt and the current possession of those weapons.

In line with the words' plain meaning, it makes little logical sense then to exclude "receive." To receive something means "to take into . . . one's *possession*."[15] How can one possess (or carry) something without first receiving it? Receipt is the condition precedent to possession—the latter is impossible without the former.

Second, what the Government is suggesting is absurd in practice. If receiving a firearm were illegal, but possessing or carrying one remained a constitutional right, one would first need to break the law to exercise that right. And if buying (receiving) a gun is not covered by the Second Amendment's plain text, neither would selling one. So according to the Government, Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the buying and selling of firearms. What a marvelous, Second Amendment loophole!

The clear answer is that "keep and bear arms" includes receipt. Thus, the Government must justify § 922(n) through a historical analysis, establishing that it aligns with this Nation's historical tradition of firearm regulation.

IV. **The Government's arguments rest on historical analogies to laws disarming groups the legislature considered non-law abiding, unvirtuous, or dangerous.**

---

[13] *Id.*
[14] *Have*, OXFORD ENGLISH DICTIONARY (3d ed. 2015).
[15] *Receive*, OXFORD ENGLISH DICTIONARY (3d ed. 2015).

The *Quiroz* court already outlined § 922(n)'s history in depth, so only a brief history is worth repeating. Section 922(n)'s history began in 1938 when Congress passed the Federal Firearms Act ("FFA").[16] At the time, the FFA prohibited "individuals under indictment for, or convicted of, a crime of violence from shipping or transporting any firearms or ammunition in interstate commerce."[17] The Act only covered those under indictment in federal court and "crimes of violence" was commonly understood to include only those offenses "ordinarily committed with the aid of firearms."[18]

The Government does not illuminate any direct history, instead reasoning by analogy to other historical restrictions. These analogical arguments can be summed up into a single sentence: Second Amendment rights are reserved only for "law-abiding, responsible citizens" and thus there is "a longstanding tradition of categorically restricting the gun rights of groups viewed by legislatures as unvirtuous, and of substantially restricting the liberty of those credibly accused of wrongdoing."[19]

### A. *Heller*'s endorsement of felon-in-possession laws does not automatically make § 922(n) constitutional.

One of the Government's arguments is that § 922(n)'s restriction on felony indictees has the same historical pedigree as 922(g)(1)'s "prohibition[] on the possession of firearms by felons"—which Heller expressly endorsed.[20] Thus, *Heller* would endorse the same for § 922(n).

The *Quiroz* court has already exposed the glaring flaws in that argument. Indeed, "the Government's argument can be boiled down to the following syllogism:

(1)   felon-in-possession laws have the same history as § 922(n);

---

[16] *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482, *4 (W.D. Tex. Sept. 19, 2022) (citing 5 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed)).
[17] *Id.*
[18] C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 702 (2009).
[19] Doc. 49 at 7.
[20] *Id.* at 13.

(2)     *Heller* endorsed felon-in-possession laws as constitutional;

(3)     Therefore, § 922(n) is constitutional.

The first problem with this argument is it's a logical fallacy. Sharing a history with felon-in-possession laws makes § 922(n) constitutional in the same way a dog is a cat because both have four legs."[21] Second, "*Heller*'s endorsement of felon-in-possession laws was in dicta."[22] Anything not the "court's determination of a matter of law pivotal to its decision" is dicta.[23] Dicta is therefore "entitled to little deference because they are essentially ultra vires pronouncements about the law."[24] And without any analysis showing why *Heller*'s dicta on *felons* proves the constitutionality of proscriptions against those who *are not yet felons*, the Court remains unconvinced.

### B. The Second Amendment's right of "the people" is not enshrined solely with "law-abiding citizens, responsible citizens."

The Government next claims that the right to keep and bear arms belongs to "'law-abiding, responsible citizens.'"[25] Thus, Defendant is not a "law-abiding citizen" and is not protected by the Second Amendment. The Court disagrees with that reading for three reasons.

First, the right to "keep and bear arms" is held by "the people." And the crux of *Heller*'s reasoning—that the Second Amendment enshrined an individual right—highlights that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all *members of the political community*, not an unspecified subset."[26] So the *Heller* Court's

---

[21] *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482, *5 (W.D. Tex. Sept. 19, 2022).
[22] *Id.*
[23] Bryan A. Garner, et al., The Law of Judicial Precedent 44 (2016) (quoting *Black's Law Dictionary* 849 (Bryan A. Garner ed., 10th ed. 2014).
[24] *Id.*
[25] Doc. 49 at 7 (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022)).
[26] *D.C. v. Heller*, 554 U.S. 570, 580 (2008) (emphasis added).

"determination of a matter of law pivotal to its decision" defined "the people" as "members of the political community," not "law-abiding, responsible citizens."[27]

Second, history supports Justice Scalia's "members of the political community" definition. For example, at the time of the Second Amendment's ratification, the right to vote, hold public office, or serve on a jury were thought of as equal to keeping and bearing arms because all were so-called "political rights."[28]

Third, like Justice Stevens noted in his *Heller* dissent, if "the people" is restricted to "law-abiding, responsible citizens," and "the people" means the same group in the First and Fourth Amendments—like Justice Scalia reasoned in *Heller*—those other constitutional protections are endangered.[29] Indeed, "the class of persons protected by the First and Fourth Amendments is *not* so limited; for even felons (and presumably irresponsible citizens as well) may invoke the protections of those constitutional provisions."[30]

Taking Justice Stevens' argument further, defining "the people" as law-abiding, responsible citizens would lead to absurd results. The Government surely doesn't believe that someone ticketed for speeding—thus, not abiding by the law—should lose their Second Amendment rights. Nor should the person who negligently (irresponsibly) forgets to set out the "Wet Floor" sign after mopping lose their Second Amendment rights. Of course not. Whether intended or not, the absurd consequences are there all the same.

---

[27] Bryan A. Garner, et al., The Law of Judicial Precedent 44 (2016) (quoting *Dicta*, Black's Law Dictionary 849 (Bryan A. Garner ed., 10th ed. 2014).
[28] Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (Yale University Press 1998).
[29] *Heller*, 544 U.S. at 644 (Stevens, J. dissenting).
[30] *Id.*

### C. The Government fails to explain why proposed language from three states' ratifying conventions supports disarming people today.

The Government also hangs its historical argument on the idea that there is a historical tradition of disarming "dangerous persons," citing debates from the Pennsylvania, Massachusetts, and New Hampshire ratifying conventions, "which were considered 'highly influential' by the Supreme Court in *Heller*."[31]

In the Pennsylvania convention, the influential Pennsylvania Minority suggested that the right to arms be guaranteed "unless for crimes committed, or real danger of public injury from individuals."[32] The Massachusetts convention's proposed amendment was that the Second Amendment "be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms."[33] Likewise, one of New Hampshire's proposed amendments was that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion."[34]

But those proposed amendments were just that: proposed. In the Seventh Circuit's *Kanter v. Barr*, now-Justice Barrett's dissent noted four problems with using those conventions as evidence of the founder's intent. First, none of the relevant limiting language from those conventions made its way into the Second Amendment.[35] Second, New Hampshire's proposal—the least restrictive of the three—was the only proposal to carry a majority of its convention.[36] Third, proposals from other states that advocated a constitutional right to arms did not contain similar language of limitation or exclusion.[37] Lastly, similar limitations or exclusions do not

---

[31] Doc. 49 at 9 (quoting *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc).
[32] *Kanter v. Barr*, 919 F.3d 437, 455 (7th Cir. 2019) (Barrett, J., Dissenting) (citing 2 Bernard Schwartz, The Bill of Rights: A Documentary History 681 (1971).
[33] Bernard Schwartz, The Bill of Rights: A Documentary History 674–75, 681 (1971).
[34] *Id.*
[35] *Kanter*, 919 F.3d at 455.
[36] *Id.*
[37] *Id.*

appear in any of the four parallel state constitutional provisions enacted before ratification of the Second Amendment.[38] Thus, using mere proposed provisions to prop up the Government's argument is unavailing.

### D. Disarmament of the politically disloyal is the very tyranny the Second Amendment sought to deter.

The Government makes another historical analogy to the colonies disarming those unwilling to take an oath of allegiance.[39] In the mid- to late-1770s, several states did allow guns to be confiscated from all persons refusing to take allegiance oaths.[40] Thus, the Government reasons, there is a history of disarming those the government perceives as a "threat."[41]

What the Government omits, however, is that even while still under English rule, the colonies' attitude toward disarming individuals diverged from its English roots. Indeed, when Virginia disarmed all citizens who refused to take an allegiance test, it did so only partially, allowing citizens to keep "such necessary weapons as shall be allowed him by order of the justices of the peace at their court, for the defense of his house and person."[42] So even "traitors" unwilling to swear allegiance to the Crown retained their weapons in colonial America.

Punishment for failing to display the proper political affiliation was also what the Second Amendment was meant to deter. With British tyranny still fresh on their minds, the founders understood that "[t]o preserve liberty, it is essential that the whole body of people always possess arms, and be taught alike, especially when young, how to use them."[43] Or as Noah Webster put

---

[38] *Id.*
[39] Doc. 49 at 8.
[40] Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 265 (2020) (e.g., in 1777, North Carolina stripped "all Persons failing or refusing to take the Oath of Allegiance" of any citizenship rights).
[41] Doc. 49 at 8.
[42] 1 George I, stat. 2, c. 13 (1714); and "An Act for Disarming Papists and Reputed Papists, refusing to take the oaths to the Government," (1756), Hening, Statutes at Large, 7:35.
[43] Richard Henry Lee, *Additional Letters from the Federal Farmer* 170 (1788).

it: "The supreme power in America cannot enforce unjust laws by the sword; because the whole body of the people are armed."[44]

Lastly, the Government's allegiance-oath analogy could be used elsewhere. Consider how those burning the United States flag could be disarmed because history supports disarming those disloyal to the government. The Supreme Court has already upheld the First Amendment rights of those burning American flags.[45] But if the Government believes the history of disarming someone because of political allegiance oaths grants the authority to disarm today, that reasoning would justify disarming political dissidents.

### E. Branding people "unvirtuous" or "dangerous" has historically been a slippery slope.

Finally, the Court wonders if the Government sees anything concerning about relying on historical laws that disarmed anyone seen as "unvirtuous" or "dangerous." Indeed, the Government not only relies on those laws in its briefing but also advocates for the Court to base its decision off them.[46]

One reason such reasoning disturbs this Court is that it's no secret that legislatures in the United States have abused that standard to restrict the Second Amendment rights of "Native Americans, Black people, and indentured servants."[47] Even the Supreme Court noted as much in both *Bruen* and *McDonald v. City of Chicago*.[48]

---

[44] Noah Webster, *An Examination into the Leading Principles of the Federal Constitution*, in Pamphlets on the Constitution of the United States 56 (Ford ed. 1888).
[45] *Texas v. Johnson*, 491 U.S 397 (1989).
[46] Doc. 49 at 7 ("The Second Amendment has always let governments disarm or restrict the gun rights of "unvirtuous" or dangerous citizens.").
[47] *Range v. Att'y Gen. United States*, 53 F.4th 262, 276 (3d Cir. 2022), *reh'g en banc granted, opinion vacated sub nom. Bryan David Range, Appellant v. Attorney General United States of American; Regina Lombardo, Acting Dir., Bureau of Alcohol, Tobacco, Firearms, & Explosives*, No. 21-2835, 2023 WL 118469 (3d Cir. Jan. 6, 2023).
[48] 561 U.S. 742 (2010).

After the Civil War, "systematic efforts" were made to disarm Black people from *obtaining*, possessing, or carrying a firearm.[49] For example, an 1833 Florida statute authorized "white citizen patrols to seize arms found in the homes of slaves and free blacks, and provided that blacks without a proper explanation for the presence of the firearms be summarily punished, *without benefit of a judicial tribunal*."[50] Another example would be the aftermath of the Cincinnati race riots in 1841. The day after the riot was quelled, all Black people were disarmed.[51] And the day after that, white rioters ransacked the now-defenseless Black residential district.[52] That pretextual disarmament, a process devoid of constitutional protections, wrenched away Black residents' "individual right to self-defense"—"the central component" of their Second Amendment right.[53]

The Government also cites the Seventh Circuit's reasoning in *United States v. Yancy* to argue legislatures have long had the right to disarm "unvirtuous citizens."[54] *Yancy*'s reasoning on "unvirtuous citizens" quotes an influential 1868 constitutional treatise, which stated constitutional rights did not apply to "the idiot, the lunatic, and the felon."[55] But what that reasoning omits is how Black people at the time were treated the same as lunatics: "Pistols old muskets, and shotguns were taken away from [freed slaves] as such weapons would be wrested from the hands of *lunatics*."[56]

---

[49] *Id.* at 771.
[50] Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 338 (1991) (emphasis added) (citing Act of Feb. 17, 1833, ch. 671, §§ 15, 17, 1833 Fla. Laws 26, 29).
[51] *Id.* at 342.
[52] *Id.*
[53] *D.C. v. Heller*, 554 U.S. 570, 599 (2008).
[54] Doc. 49 at 9 (citing *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010)).
[55] *Yancey*, 621 F.3d at 685 (citing Thomas M. Cooley, A Treatise on Constitutional Limitations 29 (Boston, Little Brown & Co. 1868)).
[56] S. Exec. Doc. No. 43, 39th Cong., 1st Sess., 8 (1866) (emphasis added).

So no matter how many times courts or the Government "categorically reject the notion that distinctions based on race, class, and religion correlate with disrespect for the law or dangerousness," it doesn't change the fact that they are citing those historical travesties to support taking someone's Second Amendment rights today.[57] And again, not only citing in support "status-based regulations [that] are repugnant (not to mention unconstitutional)," but also advocating for that reasoning to be the controlling standard today.[58] Just this time, the argument goes, the bare legislative majority will only brand the "right" people unvirtuous or dangerous.

### F. Nineteenth century surety laws addressed the same societal fear as § 922(n) but used materially different means.

The Government's final analogy is to the 19th century surety laws outlined in *Bruen* as a historical example of restricting gun rights for those accused but not convicted of wrongdoing.[59] The 1795 surety laws required a person "reasonably likely to 'breach the peace,' and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm."[60] The Government also claims that those surety statutes burdened Second Amendment rights "more directly" than § 922(n)'s prohibitions.[61] Yet this argument ignores the rest of Justice Thomas's analysis.

Justice Thomas dismisses the contention that surety laws were a severe restraint as having "little support in the historical record."[62] Surety laws were "not meant as any degree of punishment."[63] And there's little evidence that such laws were regularly enforced.[64] Indeed, the

---

[57] *Range v. Att'y Gen. United States*, 53 F.4th 262, 276, n.18–19 (3d Cir. 2022) ("Again, we cite the repugnant, status-based regulations of an earlier period—disarming individuals on the basis of political affiliation or non-affiliation—merely to demonstrate the Nation's tradition of imposing categorical, status-based bans on firearm possession.").,
[58] *Id.* at n.18.
[59] Doc. 49 at 15.
[60] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2148 (2022).
[61] Doc. 49 at 14.
[62] *Bruen*, 142 S. Ct. at 2149.
[63] *Id.* (quoting W. Blackstone, Commentaries on the Laws of England 249 (1769)).

handful of cases highlighted by Justice Thomas from Massachusetts and the District of Columbia all involved "black defendants who may have been targeted for selective or pretextual enforcement."[65]

Not only do Massachusetts' mid-19th century surety laws fail to support the Government, but they also actively cut against the Government's assertions. In *Bruen*, Justice Thomas stated, "[i]f earlier generations addressed [a general societal problem that has persisted since the 18th century], but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional."[66]

Much like § 922(n), Massachusetts' surety laws addressed the societal fear that those accused—like those under indictment—would "make an unlawful use of [their firearm]."[67] Yet surety laws addressed that fear through means "materially different" than § 922(n).[68] Rather than completely restrict the accused's constitutional right, surety laws permitted the accused to prove a special self-defense need. And if they couldn't, the accused needed only to post a money bond for no more than six months to keep their firearms.

In contrast, § 922(n) restricts a person's right to receive a firearm indefinitely after indictment by a grand jury—which is not an adversarial proceeding.[69] What's more, the Government concedes "an indictee cannot overcome § 922(n)'s restriction by posting a bond."[70] Thus, the existence of Massachusetts' surety laws—addressing a general societal problem

---

[64] *Id.*
[65] *Id.*; *see* R. Leider, Constitutional Liquidation, Surety Laws, and the Right To Bear Arms 15–17, in *New Histories of Gun Rights and Regulation* (J. Blocher, J. Charles & D. Miller eds.) (forthcoming).
[66] *Bruen*, 142 S. Ct. at 2131.
[67] *See* A View of the Constitution of the United States of America 126 (2d ed. 1829))
[68] *See Bruen*, 142 S. Ct. at 2131.
[69] *United States v. Jones*, 160 F.3d 641, 646 (10th Cir. 1998) (citing *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 430 (1983) ("[a] grand jury investigation is not an adversarial process").
[70] Doc. 49 at 16.

through materially different means—serves only as more evidence that § 922(n) departs from this Nation's historical tradition of firearm regulation.

## CONCLUSION

In short, this Court agrees with our sister court in *Quiroz* and other district courts that have held § 922(n) to be unconstitutional after *Bruen*.[71] This Court is also skeptical of using historical laws that removed someone's Second Amendment rights based on race, class, and religion to support doing the same today. Indeed, the Court believes that "rejecting" the discriminatory application of those unconstitutional laws historically—while still arguing those laws should be a basis for the Court's decision—walks too fine a line. As a result, the Government did not meet its burden, and the Court holds § 922(n) is unconstitutional.

It is therefore **ORDERED** that Defendant's Motion to Dismiss Indictment is **GRANTED**. (Doc. 47).

It is so **ORDERED** this 9th day of January, 2023.

_____
ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

---

[71] *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022); *see also United States v. Holden*, No. 3:22-CR-30 RLM-MGG, 2022 WL 17103509 (N.D. Ind. Oct. 31, 2022); *United States v. Stambaugh*, No. CR-22-00218-PRW-2, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022).